## Paul G. Johnson, Appellant, v. Lavanch D. Johnson, Appellee.

### Gen. No. 34,092.

Opinion filed May 29, 1930.

L. T. PELNAR and J. B. BERNARD, for appellant.

No appearance for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In a proceeding for the annulment of complainant's marriage with defendant upon the ground of her fraud, the court, after *ex parte* hearings, entered a decree on December 18, 1929, dismissing complainant's bill for want of equity. The present appeal followed. Defendant has not appeared or filed a brief in this court.

In the bill, filed August 14, 1929, complainant alleged that he is, and has been for more than a year, a resident of Cook county, Illinois; that he was married to defendant at Stillwater, Minnesota, on August 30, 1928; that they never thereafter lived together and the

marriage never was consummated; that she immediately deserted him without cause; that such desertion was a part of a "preconceived plan," formed by her prior to the marriage and unknown to complainant, "never to live with him as his wife and assume her marriage duties"; that immediately prior to the marriage, and for the purpose of deceiving him and inducing him to enter into the marriage contract, she made to him "false, deceitful and fraudulent statements and promises," upon which he relied, that she would fulfil all her marriage obligations; that he was at all times ready, able and willing to comply with his marriage duties and provide a home for her; that after he discovered her fraud he never in any manner waived it; and that at the time of the marriage there was in force, and still is, a statute of Minnesota which provides that where the consent of either party to a marriage "has been obtained by force or fraud, and there is no subsequent voluntary cohabitation of the parties, the marriage may be annulled at the suit of the injured party and shall be void from the time its nullity is adjudged."

Defendant was personally served with process in Chicago, on August 17, 1929, when she was on a visit to the city. She did not appear or file any pleading and was defaulted.

The certificate of evidence, as finally certified by the trial judge on the day the decree was entered, presents some extraordinary features. It discloses that there was a hearing on October 30, 1929, at which complainant was the only witness. He testified in substance that he was, and had been since 1925, a resident of Chicago; that he first became acquainted with defendant in 1921 while they were attending school at Farwell, Minnesota; that in August, 1928, defendant was employed in Minneapolis, Minnesota, and there was living at the home of an aunt; that on August 23, 1928,

complainant went to Minneapolis on a vacation trip, called upon defendant and was frequently in her company during the following week; that while they were having luncheon together on August 30, 1928, *she* proposed that they get married immediately, but that the marriage be kept secret for a few days until she notified her parents and friends; that he agreed to the proposal; that early that afternoon, immediately following the luncheon, they drove to Stillwater, Minnesota, procured a license, and were married at the home of a minister early that evening; that, returning to Minneapolis, they went to her home where they conversed about the future,—she telling him ''to find an apartment'' in Chicago and that she ''would be down in a few days''; that the marriage was not then or ever consummated; that he then gave her $50 for her expenses to Chicago; that he left her about 11 o'clock, p. m., and departed for Chicago the following morning; that he has *never seen her since;* that for over two months following they corresponded frequently; that in his letters he continually urged her to come to Chicago and she in her letters kept ''putting it off''; that he had ''burned up'' all of her letters, *except one* which he received ''the last of November, 1928''; and that he *did not thereafter attempt to see her.*

The witness, being then handed a paper purporting to be a letter, further testified that ''it was sent to me by my wife,'' and that ''it is in her handwriting and is signed by her.'' Then follows in the transcript the following statement in brackets, viz.: '' (Whereupon said document, so offered in evidence as 'complainant's exhibit A,' was admitted in evidence, and *is made a part of the record hereof*.)'' Then follows, as the next two pages, what *purports to be* an original letter. The body is in ink handwriting; it is not dated, except the word ''Tuesday''; it is addressed ''Dear Paul'' and is signed ''Lavanch''; but it does not bear any identifica-

tion mark of the reporter as to its being "complainant's exhibit A." It is in part as follows:

"Received your letter this A. M. . . . I have been trying to decide just how to explain this to you. I can't come to Chicago and live because I never did intend to—not even at the time we were married. I've been stalling around but now I really mean it. . . . All I wanted when I married you was to have the name of a married woman. Never meant to really be your wife and live with you as such. Right now I am happy as I am living like I'm single. I like my work and its easy to support myself. This way I can have all the privileges I want and yet have a married name. I hate to write this letter, but I may as well tell you the truth and get it over with. Now that you know it you can do as you like, but I have your name."

Then follows further testimony of complainant to the effect that, just before defendant was served with process, he was informed that she was temporarily in Chicago stopping at a Chicago hotel, that he notified his lawyer of that fact, but that he did not see her while she was in Chicago. Then follows the statement by the court that the further hearing of the cause would be continued until November 9, 1929. Then follows the affidavit of Veronica H. Reynolds, sworn to on October 30 (the day of said hearing), that she is the reporter who took down in shorthand the evidence at the trial and that "the foregoing is a correct transcript of the same."

The certificate of evidence also discloses that a further hearing was had on November 16, 1929. Complainant again testified, but his testimony does not show any additional facts bearing upon the charges in the bill. Thereupon complainant called as a witness Alvin B. Olson, a resident of Chicago. He testified that he was a brother-in-law of complainant and had known him for 20 years; that he had known defendant

since 1921; that he and his wife accompanied complainant to Minneapolis on the vacation trip in August, 1928; that while there he several times saw defendant, and on August 29, 1928 (the day before the marriage), had a conversation with her; that he said "Lavanch, why don't you and Paul get married"; that she replied, "For one thing, Paul never asked me, and another thing, I have another fellow I like kind of well"; that he said, "Paul would make a very nice husband and I would be glad to see you settled"; that she replied, "I would like to have somebody to pay my bills; I could run around; but I would never come to Chicago and settle down"; and that the conversation then was interrupted by complainant's appearance.

The certificate of evidence also discloses that a still further hearing was had before the chancellor on December 7, 1929. Complainant's solicitor stated that he had "two affidavits signed by two witnesses who have read the *letter* and know its contents." Thereupon the court directed that the two witnesses be sworn, and Clara L. Denny testified in substance that she is office manager of an incorporated company engaged in the business of court reporting in Chicago; that a letter, introduced in evidence on October 30th, has been *lost or mislaid;* that in the course of her duties she frequently checks over transcripts of evidence written out by court reporters employed by the company; that she remembers reading the evidence taken in the case of *Johnson v. Johnson,* and also the letter; and that she has a "fair recollection" of its contents, though she does not remember its date. The witness then gave her best recollection of its contents as follows:

"She (meaning defendant) stated to this man, her husband, that at the time she married him she had no intention of living with him as his wife, that she simply married him for, well, to have the name of being a

married woman, and that it was useless to write her any longer as she had no intention of coming to Chicago to live. I remember her name was signed at the end of the letter."

Thereupon Veronica H. Reynolds, the same reporter who certified to the correctness of the transcript of the evidence introduced at the hearing on October 30, testified that at that hearing a letter was "*marked* complainant's Exhibit A" and introduced in evidence; that she took the letter to her office and put it in her desk; that on November 8, the day before the case was coming up for further hearing, complainant's solicitor requested her to present her transcript of the evidence, and the letter, in court the following morning, but "not to attach the letter to the transcript as he wanted to present it to the judge"; that she put the transcript and the unattached letter in an envelope and gave instructions that the package be delivered in court the following morning, which instructions were carried out; that thereafter in some manner the letter was lost; that she personally did not learn of the loss until November 16, when the second hearing was had; and that "we have looked everywhere for the letter but have been unable to find it." The witness further testified that after the letter came into her possession she read it and that therein "she (defendant) stated she married him for the name only, that she never intended to live with him as man and wife, that he might just as well stop writing as it was useless, and that she never intended to come to Chicago." Thereupon, at complainant's solicitor's request, the court directed that the two affidavits of the witnesses (Mrs. Denny and Miss Reynolds) be "read into the record." This was done. With some minor differences they are respectively in accord with the testimony of the witnesses. It is, however, stated in each affidavit that the letter "was addressed to Paul G. Johnson, Chicago, Illinois and was signed by Lavanch D. Johnson."

Each affidavit is sworn to on December 7. On the next page of the transcript is Miss Reynolds' affidavit, sworn to on December 7, that "she is the reporter who took down in shorthand the evidence at the trial of the above case, and the foregoing is a correct transcript of the same." On the next page is the trial judge's certificate in the usual form. At the end of the transcript of the record is the usual certificate of the clerk of the court, and he certifies that the *original* certificate of evidence is incorporated in said transcript.

In complainant's printed abstract of record, prepared by his counsel and filed in this court on January 15, 1930, the proceedings before the chancellor on December 7, 1929, are not abstracted. Indeed, no mention whatever is made of them or that a letter had been lost. On page 12 of the abstract, a letter, addressed to "Dear Paul" and signed "Lavanch," is set out in full as if it were a true original, and complainant's counsel in his printed brief and argument treats it as such.

Counsel here contends that the decree, dismissing complainant's bill for want of equity, is contrary to the law, in view of complainant's testimony, Olson's testimony and defendant's admissions as contained in the letter. Counsel argues in substance that the testimony and letter sufficiently disclose such fraud on defendant's part at the time of the marriage as warrants a decree of annulment. We cannot agree with the contention or argument. It is apparent that, without taking into consideration defendant's claimed letter, complainant utterly failed to prove the charges of fraud in his bill. And it may well be that the chancellor in view of the facts and circumstances entertained doubts, as we do, as to the genuineness of the letter. But, even assuming its genuineness and that defendant had intentions at the time of the marriage as stated in the letter, we do not think that the court would have been justified in granting an annulment of the marriage un-

der decisions in this State and the general current of authority in other jurisdictions. In 19 Ency. Law, 2d Ed., p. 1184, it is said: ''The degree of fraud sufficient to vitiate an ordinary contract will not afford sufficient ground for the annulment of a marriage. It is not sufficient that the party relied upon the false representations and was deceived, or that important and essential facts were concealed with intent to deceive. The marriage relation is a status controlled and regulated by considerations of public policy which are paramount to the rights of the parties.'' In 38 Corpus Juris, in a subdivision relating to proceedings for annulment of marriages, at page 1354, section 131, it is said: ''The burden is on plaintiff to sustain his material allegations. . . . In view of the peculiar nature of marriage and the grave consequences attendant upon its subversion, the courts will not grant a decree of nullity except upon the production of clear, satisfactory and convincing evidence.'' In a footnote numerous cases decided in different States are cited, including two in Illinois, viz.: *Lyon v. Lyon,* 230 Ill. 366, and *Beckley v. Beckley,* 115 Ill. App. 27. In the *Lyon* case the husband's bill for annulment, on the ground of fraud, of a marriage in the State of New York was, upon demurrer, dismissed for want of equity and the decree affirmed. After quoting with approval the above statement in 19 Ency. Law, the court says (p. 371): ''The fraudulent representations for which a marriage may be annulled must be of something essential to the marriage relation,—of something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life.'' And the court further says (p. 372):

''The statute of New York mentioned in the bill merely declares the law as it exists in Illinois,—that a marriage procured by fraud may be annulled. The kind and degree of evidence required for such purpose

must be determined by the court in which the suit is brought, according to the law of the forum. The bill proceeds on the theory that appellant's consent to the marriage was obtained by fraud, and sets out the facts constituting the fraud. Whether those facts constitute fraud must be determined by the law of the forum, and the superior court did not err in sustaining the demurrer to the bill.''

In *Bielby v. Bielby,* 333 Ill. 478, the wife filed a bill in the circuit court of Cook county for a separate maintenance. The husband answered, and filed a cross-bill praying that the marriage, which occurred in Cook county on July 8, 1925, be annulled on the ground of fraud, and further praying that certain conveyances of 40 acres of land, made by him at the time of the marriage to them in joint tenancy, be set aside. After a hearing a decree was entered dismissing her bill, finding the equities with him, and decreeing that the marriage be annulled and that the conveyances be set aside. Upon her appeal the Supreme Court reversed the decree and remanded the cause with directions to dismiss both bills. The husband claimed that after the marriage the parties never lived or cohabited together owing to her refusal so to do, that she married him for the sole purpose of inducing him to convey his land to her in joint tenancy, and that at the time of the marriage simulated affection for him but never intended to live with him as his wife. In the court's opinion (p. 483) it appears that, to sustain the decree of annulment, it was argued before the Supreme Court that she had ''falsely promised to live with him and make a home for him without any intention of so doing.'' The court, however, held (p. 486) that there was ''no basis in the evidence upon which a decree of annulment could be founded and the circuit court erred in entering such a decree.'' In discussing counsel's argument the court repeats certain statements made in the *Lyon* case,

*supra,* quotes from 2 Kent's Commentaries, p. 77, and says (p. 484):

"The misrepresentation, in order to constitute fraud for which an annulment of a marriage may be decreed, must be as to some existing fact, as, a legal or physical impediment to the marriage, and not a promise as to future conduct. Even in ordinary civil cases, representations, to be fraudulent, must relate to a present or past state of facts and not to promises looking to the future."

In view of the evidence and all the facts and circumstances disclosed in the present record, and of the authorities mentioned, we are of the opinion that the decree of the circuit court, dismissing complainant's bill for want of equity, should be affirmed, and it is so ordered.

*Affirmed.*

BARNES, P. J., and SCANLAN, J., concur.